### Charles T. FRANCIS

v.

### BUTTONWOOD REALTY CO.

**Nos. 99–92–M.P., 99–95–M.P.**

Supreme Court of Rhode Island.

Jan. 24, 2001.

Paul S. Ryan, Herbert F. DeSimone, Providence, for Plaintiff.

Milton S. Slepkow—Mount Hope Realty, Allan M. Shine, Howard E. Walker, Brent Canning, Diane Finkle—Buttonwood Realty, Providence, for Defendant.

Present WEISBERGER, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

LEDERBERG, Justice.

The petitioners, Antonio Matos and Antonio Matos, L.L.C. (collectively, Matos) and Mount Hope Realty, L.L.C. (Mt.Hope) sought our review of an interlocutory Superior Court order that rendered null and void the agreements for the sale of property between the petitioners and one of the respondents,[1] the receiver of Buttonwood Realty Co. (Buttonwood). The issues before us are (1) whether the petitioners' requests that the receiver secure tax abatements prior to the sale of real estate constituted a "condition precedent" that the petitioners could not waive unilaterally and (2) whether the receiver's fiduciary duties to creditors prevailed over a prior court order to proceed with the sale of the property. For the reasons stated below, we grant certiorari and quash the February 11, 1999 and November 3, 1999 orders of the Superior Court.

---

1. The Town of Bristol, Rhode Island, as Buttonwood's main secured creditor, joined the receiver as a respondent, although no entry of such appears in the record. The town adopted the arguments advanced by the receiver in opposing Matos's and Mt. Hope's petitions and appeals and subsequently submitted a brief and participated in oral arguments.

## Facts and Procedural History

The facts in this receivership proceeding are undisputed. An order appointing a permanent receiver of Buttonwood was entered on February 21, 1990, after Charles T. Francis—a major stockholder of Buttonwood—petitioned the Superior Court for appointment of a receiver on the basis of Buttonwood's alleged insolvency. Buttonwood's sole asset consisted of two parcels of real estate in the Town of Bristol (the town), on which were located the former Fulflex Manufacturing Facility (Fulflex property) and the former Minor Industries Manufacturing Facility (Minor property). Both parcels were designated Superfund sites by virtue of major environmental contamination that necessitated comprehensive environmental studies by the Rhode Island Department of Environmental Management (DEM) and substantial environmental remediation by the federal Environmental Protection Agency (EPA). The receiver could not offer the properties for sale until some of the industrial pollutants had been removed and federal and state environmental agencies had assessed the sites. Any prospective purchasers were required to enter into settlement agreements with DEM under the Brownfield[2] program for reuse of industrial properties, pursuant to the Rhode Island Industrial Property Remediation and Reuse Act, G.L.1956 chapter 19.14 of title 23, requiring additional expenditures of approximately $160,000 for both properties.[3] In 1998, after partial environmental remediation, the receiver advertised the property for sale and received the highest bids of $55,000 from Matos for the Fulflex property and $30,000 from Mt. Hope for the Minor property.

The receiver entered into purchase and sale agreements with Antonio Matos on May 4, 1998, and with Mt. Hope on May 19, 1998; closing dates were to occur "in no event later than six (6) months after entry of the Court Order approving [these] Agreement[s]." The Matos agreement contained the following provision:

> "Purchase[r] shall not be obligated to close if Purchaser has not received a Satisfactory Discharge of outstanding real estate taxes * * * pursuant to any Agreement between the Receiver and the Town of Bristol regarding reduction of such taxes, and provided Purchaser obtains a satisfactory Discharge of such taxes from the Town of Bristol."

The equivalent paragraph in the agreement with Mt. Hope specified that:

> "[r]eal estate taxes * * * shall be apportioned as of the Closing Date, and the net amount thereof shall be added to or deducted from, as the case may be, the Purchase Price, subject to any Agreement between the Receiver and the Town of Bristol regarding reduction of such taxes, and provided Purchaser obtains a satisfactory Discharge of such taxes from the Town of Bristol."

Both agreements contained the following provision, conditioning the purchase on court approval:

> "Purchaser acknowledges and understands that * * * any offers for the

2. Brownfields are defined by the EPA as " 'abandoned, idled or underused industrial and commercial facilities where expansion or redevelopment is complicated by real or perceived environmental contamination.' " United States General Accounting Office, *Superfund: Barriers to Brownfield Redevelopment*, GAO/RCED–96–125 (June 17, 1996).

3. As set forth in the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C.A. § 9607(a) (West 1995),

"(1) the owner and operator of * * * a facility * * * (4) * * * shall be liable for— (A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan." The Rhode Island Industrial Property Remediation and Reuse Act provides for similar liabilities in G.L.1956 § 23–19.14–6, but also allows for exemptions to liability. For a more extensive discussion of liability theories in a case actionable under CERCLA, *see Hydro–Manufacturing, Inc. v. Kayser–Roth Corp.*, 640 A.2d 950 (R.I.1994).

purchase of the Real Estate that may be submitted to the Receiver subsequent to the execution of this Agreement for a purchase price higher than or on more advantageous terms than that set forth herein must be brought to the attention of the Court for said Court's review and consideration."

Subsequently, the receiver petitioned the Superior Court for authorization to sell the properties "free and clear of interests, claims, liens and encumbrances." After a brief hearing on May 20, 1998, an order was entered on behalf of each petitioner authorizing the receiver to sell the properties "free and clear of all interests, claims, liens and encumbrances" and to execute a deed "free and clear of all interests, claims, liens and encumbrances," "upon the terms of the Purchase and Sale Agreement[s]." The town failed to object to the sale at this hearing. Six months later, the receiver formally requested a tax abatement from the town, stating that without "an abatement of all outstanding taxes through the closing date with the purchaser in order to deliver title to the purchaser in accordance with the terms and conditions of the Sales Agreements * * * these sales cannot be consummated."[4]

On November 30, 1998, Matos's counsel wrote to the receiver, warning him that "[i]f the outstanding taxes * * * are not abated in full at the next Town Meeting, our client will not proceed further with this transaction." On December 1, 1998, Matos's counsel wrote again to the receiver, stating that "it is the responsibility of the Receiver to receive the tax abatement as a condition precedent to the purchase." One week later, Matos and the receiver entered into a second amendment to the purchase and sale agreement that extended the closing date to December 17, 1998, the day after an expected decision by the town council on granting a tax abatement. The amendment also included a provision that conditioned the closing of the sale "without limitation, [on] the payment and/or discharge of all taxes relating to the Real Estate for the period prior to the Closing Date," in the absence of which "the Receiver shall return to Purchaser the deposit paid by Purchaser to the Receiver pursuant to this Agreement with interest earned thereon, if any, and the Purchaser shall be entitled to bring an action for specific performance of this Agreement, or other remedies at law or in equity." Amendments between the same parties extended the closing date ultimately to February 3, 1999.

On December 16, 1998, the town council declined to approve the requested tax abatements, expressing concern over the low purchase prices for the properties, and scheduled a workshop to consider offers from other prospective purchasers. Two substantially higher offers were submitted on the day of the workshop,[5] and the town council once again deferred the decision on

---

4. It appears from the record that if the town refused a tax abatement, petitioners expected to be subject only to the existing lien for the preceding three tax years, approximately $27,422 total for three years for the Fulflex property and an estimated $2,500 per tax year for the Minor property, although the amount of unpaid real estate taxes had grown to $800,000 during the decade the property remained in receivership.

   See G.L.1956 § 44–9–1(b):

   "The lien shall terminate at the expiration of three (3) years thereafter if the estate has in the meantime been alienated and the instrument alienating the estate has been recorded; otherwise, it shall continue until a recorded alienation of the estate. The lien shall be superior to any other lien, encumbrance, or interest in the real estate whether by way of mortgage, attachment, or otherwise, except easements and restrictions."

   *See also Fitzpatrick v. Tri–Mar Industries, Inc.,* 723 A.2d 285 (R.I.1999) (per curiam) (holding that, when the city had neglected to identify it as a lien on any tax certificate, an outstanding property tax was not a valid lien, but merely an unsecured tax obligation).

5. Lenmarine, Inc. (later LM Development, L.L.C.) submitted an offer to purchase both properties for $125,000, then executed an agreement for $250,000, and one Michael J. Fonseca offered $116,500 for the Fulflex property. Both prospective purchasers joined this case as intervenors.

the tax abatement until January 27, 1999. One day before the scheduled meeting, Matos notified the receiver that it was "ready, able and willing to close the sale of the 'Fulflex Property' on February 3, 1999, as scheduled, in accordance with his agreement with [the receiver] and with the court's order of May 20, 1998," and indicated that it would accept a receiver's deed, a draft of which it had earlier reviewed. Mt. Hope sent a similar communication the next day, expressing its position that the sales agreement was not subject to the receiver's reaching any agreement on the abatement of taxes with the town, and indicating that it was willing to tender payment in exchange for a deed in the form earlier presented.

In January 1999, the town council once again continued the matter of the tax abatement. The receiver then filed a "Petition for Instructions Regarding Sale of Defendant's Real Estate," requesting an instruction that (1) a refusal of the Town of Bristol to grant a tax abatement by February 3, 1999 would constitute the failure of a condition precedent in both the Matos and the Mt. Hope sale agreements that could not be unilaterally waived by petitioners, (2) the sale agreements would be null and void in that event, and (3) the receiver would then be directed not to consummate either of the agreements.

A February 1999 hearing on the receiver's petition before a different Superior Court justice from the one who granted the May 20, 1998 orders approving the sales resulted in a finding that petitioners "by threats not to close on the agreement, * * * impos[ed] a condition precedent on the closing of the agreement * * * even if the original mutual intent [has] not been sufficiently memorialized in the agreement." The justice further found that the condition precedent had not been satisfied despite the receiver's best efforts to reach an agreement with the Town of Bristol, and finally, that the condition precedent was not subject to a unilateral waiver. In a February 11, 1999 order, the hearing

justice therefore instructed the receiver to consider the sales agreement null and void and of no further force and effect, the deposits to be returned to petitioners. The receiver subsequently sought approval to sell the property. Following a hearing before the Superior Court justice who issued the May 20, 1998 orders, an order was issued on November 3, 1999, authorizing the receiver to sell the Buttonwood property "free and clear of all interests * * * including but not limited to all statutory liens and claims of the Town of Bristol" to LM Development, L.L.C., conditioned upon the disposition of these appellate proceedings. The petitioners each filed an appeal and a petition for certiorari. This Court denied and dismissed the appeals *pro forma,* issued the writs, and consolidated the cases for briefing and oral argument. Additional relevant facts will be supplied in discussing the issues.

### Standard of Review

We have consistently explained that this Court "limits its review on certiorari 'to examining the record to determine if an error of law has been committed.'" *Gregson v. Packings & Insulations Corp.,* 708 A.2d 533, 535 (R.I.1998) (quoting *City of Providence v. S & J 351, Inc.,* 693 A.2d 665, 667 (R.I.1997) (per curiam)). This Court does not weigh the evidence presented, but rather inspects the record to ascertain whether any legally competent evidence exists therein to support the findings made by the trial justice. *Gregson,* 708 A.2d at 535.

### Waiver of Conditions Precedent

In their petitions, Matos and Mt. Hope contended that the trial justice erred when he decided that the tax abatement was a condition precedent that could not be unilaterally waived. It is well established, and this Court has recently affirmed in *Yates v. Hill,* 761 A.2d 677, 680 (R.I.2000) (per curiam), that a party may waive a condition precedent if the condition has been included for the benefit of

the waiving party. In *Yates,* the conditions at issue benefited the buyer who requested a closing date and indicated that she was ready and willing to consummate the sale upon the seller's refusal to proceed with the sale of her residence. We held in that case that "the filing of suit for specific performance * * * implicitly waive[s] any of the sale conditions that were for the benefit of the party seeking such relief." *Id.* *See also Jones v. United States,* 96 U.S. (6 Otto) 24, 28, 24 L.Ed. 644, 646 (1878) ("Conditions precedent may doubtless be waived by the party in whose favor they are made."). The purchase and sales agreements signed by the parties in the instant case indicated that the tax abatements were conditions that benefited petitioners. Matos's counsel and Mt. Hope, which was not represented by legal counsel until the commencement of litigation, urged the receiver to obtain such abatements. The petitioners and the receiver also extended the closing date several times to permit the receiver to address the town council on this issue. The trial justice found "that the purchasers by threats not to close on the agreement, unless the taxes were abated or discharged, were thereby imposing a condition precedent on the closing of the agreement." We are of the opinion, however, that petitioners were entitled to the benefit of their bargain and that their letters did not constitute an amendment to their initial agreements, notwithstanding the statement in Matos's letter of a condition precedent. Furthermore, although petitioners were not obligated to consummate the purchase if the outstanding real estate taxes had not been discharged, the original purchase and sale agreements provided that "the Purchaser, at the Purchaser's option, may waive any defects and take such title to the Real Estate as the Receiver is able to convey." When the receiver failed to negotiate the tax abatement, petitioners had the right to move forward without the benefit of tax relief, given their express waiver of that condition by informing the receiver that they were ready,

willing, and able to consummate the purchase immediately.

The receiver in this case argued that the town's abatement of the property taxes could not be waived by petitioners because the abatement did not solely benefit petitioners. The trial justice made no such finding when he determined that the condition precedent could not be waived unilaterally, but rather based his decision on the fact that the parties "mutually agreed to a condition precedent for the consummation for each of the sales agreements." By the time petitioners indicated their willingness to proceed with the purchase, "substantially more appealing offers from third parties" had been submitted to the receiver, and the receiver reasoned that his fiduciary duty towards the town as the main creditor of Buttonwood obligated him "to attempt to maximize the repayment of debt." For the reasons stated below, we are unpersuaded by this argument and hold that the trial justice erred in interpreting reference to a condition precedent as an indication of a bilateral agreement, when in fact the petitioner-buyers here were entitled to avail themselves of a waiver.

## Contractual Obligations of the Receiver

In its petition, Matos contended that the receiver, regardless of his fiduciary status, "is bound to his contract like any other citizen," citing *Onanian v. Leggat,* 2 Mass.App.Ct. 623, 317 N.E.2d 823 (1974) (holding that, although the defendant-executor was under a duty to obtain the highest possible price, he was not excused from performing an existing agreement when he subsequently received a higher offer than the plaintiff's). The court explained that

> "[t]he fiduciary duty of an executor or administrator is separate and distinct from the contractual duty he may incur when he enters into agreements with third persons. The first is owed to and enforceable by the beneficiaries of the estate, while the second is owed to and

enforceable by a stranger to the estate." *Id.* at 825.

On his part, the receiver argued that he had a fiduciary duty to the court and to the creditors of the receivership estate and therefore was obligated to maximize the repayment of debt. By the time petitioners indicated their willingness to waive the tax abatement, higher purchase offers had been received for the parcels by the receiver, and the town would have benefited from refusing the tax relief and having the agreement declared void. Accordingly, the receiver argued, because this condition precedent benefited petitioners as well as the receiver, it could not be unilaterally waived. This argument, however, assumes that the receivership status allows the obligation of a contract to be impaired, a proposition we must reject, notwithstanding any alleged overriding fiduciary duty to creditors on the receiver's part or any disputed "condition precedent" regarding the town's abatement of taxes.

In the context of employment law, this Court has stated that "[t]he authority of the receiver is limited and the rule is general that one dealing with a receiver is bound to take notice of the extent of his authority. The authority to make the contract of employment included the usual obligations of such a contract." *Anderson v. Polleys,* 53 R.I. 182, 185, 165 A. 436, 437 (1933). Noting the absence at that time of cases exactly on point—a situation that applies even with the case before us—the Court went on to explain that "[a] reason for the lack of precedents may be that the principle involved is fundamental in the law of contracts of employment either by individuals or receivers." *Id.*

Further, the status of a receiver has been described as that of one who "stands in the shoes of the person over whose estate he has been appointed, and is clothed with only such rights of action as might have been maintained by such person." *Frank v. Broadway Tire Exchange Co.,* 42 R.I. 27, 31, 105 A. 177, 178 (1918); *see also Vitterito v. Sportsman's Lodge &* *Restaurant, Inc.,* 102 R.I. 72, 228 A.2d 119 (1967) (holding that a receiver applying for a renewal of an alcoholic beverage license was bound by the same legislative requirements to which the debtor would be subjected); *Ryder v. Ryder,* 19 R.I. 188, 192, 32 A. 919, 921 (1895) (holding that "in the absence of fraud and of statutory regulations, [receivers] take only the debtor's rights, and consequently are affected with all claims, liens and equities, which would affect the debtor if he himself were asserting his interest in the property").

■ The Legislature has granted broad powers of control to enable the court in a receivership proceeding to conserve the interests of all parties involved. It is the court's obligation to establish "the terms and conditions of sale as it determines appropriate." *Bogosian v. Woloohojian,* 901 F.Supp. 68, 72 (D.R.I.1995), *appeal dismissed, vacated without opinion,* 86 F.3d 1146 (1st Cir.1996). Applying these principles to the case before us, it becomes clear that once the Superior Court had approved the sale of the property and granted the receiver's petition, the receiver was bound by the conditions embodied in the court's order.

In his initial petition to the Superior Court to sell the property in receivership free and clear of liens, the receiver determined "that it is in the best interest of the creditors of the Defendants to sell the Real Estate based upon the terms and conditions of the offers." He further requested that notice of the hearing on the petition should be given to all parties with recorded liens and encumbrances against the estate, and that such parties "be directed to execute and deliver to the Receiver * * * lien releases * * * and all other documents reasonably necessary to effectuate the release and discharge of such interests * * * without prejudice to or waiver of any such interests * * * against the sale proceeds." Finally, the receiver sought a declaration that upon consummation of the sale, all interests of the secured creditors "be declared to be released and dis-

charged." At the May 20, 1998 hearing, the receiver made the following statement about the Town of Bristol's tax lien:

"[B]ecause of the desire to try to have this property re-zoned, we understand that [the town is] prepared to seriously consider waiving all, if not most, of the taxes; and they have been very helpful and intimately involved with the receivership in this situation because although the price is not substantial, it is taking a property that has an enormous liability and hopefully turning it into productive industrial property. *We've received no objection to the sale.*" (Emphasis added.)

Thus, the receiver represented to the initial trial justice that, regardless of the sales bids or the taxes owed to the town, there were considerable other benefits that rendered the agreements advantageous to all parties. The town was not represented at these proceedings and, in the absence of any objection, two orders granting the receiver's petition were issued, authorizing the receiver to sell the real estate free and clear of all interests, claims, liens and encumbrances which were thereby transferred to the proceeds of the sale.

These May 20, 1998 orders approving the agreements authorized the sale of the properties with "all interests, claims, liens and encumbrances * * * transferred to the proceeds thereof in the same priority as prior to such transfer." The town had the right, as did any other creditor or bidder, to object to the sale up to the time of the court's approval.[6] But the town failed to object. Any bids submitted after the agreement was approved by the court entered too late. Moreover, the receiver had no authority to repudiate the terms of the original court orders, but was bound by the original conditions of the sale. Consequently, the trial justice who entered

the February 11, 1999 interlocutory order erred in interpreting the tax abatement discussions as constituting a bilateral agreement rather than a condition that could be waived by the buyers. Therefore, although the receiver was unable to secure an abatement, the petitioners have waived this condition. Hence, the November 3, 1999 order authorizing the receiver to sell the properties to LM Development, L.L.C., was also in error. Consequently, Matos and Mt. Hope are entitled to receive deeds without tax abatements, following which they can proceed to negotiate any settlement on taxes with the town.

## Conclusion

In summary, we grant the petitions for certiorari, quash the February 11, 1999 and November 3, 1999 decisions and orders, and reinstate the May 20, 1998 orders of the Superior Court, to which we remand this case with our decision endorsed thereon.

---

**6.** At oral argument, counsel for Matos suggested that the consideration of higher offers was permissible only before court approval; this interpretation was supported by the receiver's petition to sell the real estate "subject to any higher or more advantageous offers being submitted to the Receiver and the Court *at the time of the Hearing on this Petition.*" (Emphasis added.)